GLENN S. LEON
Chief, Fraud Section
MATTHEW REILLY
Trial Attorney
DELLA SENTILLES
Senior Litigation Counsel
Fraud Section, Criminal Division
    1400 New York Avenue NW
    Washington, D.C. 20530
    Telephone: (202) 320-8523
    Email:   matthew.reilly2@usdoj.gov

E. MARTIN ESTRADA
United States Attorney
LINDSEY GREER DOTSON
Assistant United States Attorney
Chief, Criminal Division
BRETT A. SAGEL (Cal. Bar No. 243918)
Assistant United States Attorney
Chief, Corporate & Securities Fraud Strike Force
    United States Courthouse
    411 West 4th Street, Suite 8000
    Santa Ana, California 92701
    Telephone: (714) 338-3598
    Facsimile: (714) 338-3561
    E-mail: brett.sagel@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. 2:23-cr-0089-DSF |
|---|---|
| Plaintiff, | GOVERNMENT'S POSITION WITH RESPECT TO THE PSR AND SENTENCING FACTORS FOR DEFENDANT TERREN S. PEIZER |
| v. | |
| TERREN S. PEIZER, | |
| Defendant. | |

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorney Brett Sagel, and Glenn S. Leon, Chief, Fraud Section, Criminal Division, and Trial Attorney Matthew Reilly and Senior Litigation Counsel Della

Sentilles, hereby files its sentencing position regarding defendant Terren S. Peizer.

This sentencing position is based upon the attached memorandum of points and authorities, the presentence investigation report, the files and records in this case, the evidence established at trial, and any other evidence or argument that the Court may wish to consider at the time of sentencing.

The government reserves the right to file any supplemental sentencing positions that may be necessary.

Dated: December 20, 2024            Respectfully submitted,

GLENN S. LEON
Chief, Fraud Section

E. MARTIN ESTRADA
United States Attorney

MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division


                                    /s/
                        _____
                        MATTHEW REILLY
                        DELLA SENTILLES
                        BRETT A. SAGEL

                        Attorneys for Plaintiff
                        UNITED STATES OF AMERICA

**TABLE OF CONTENTS**

<u>DESCRIPTION</u>                                                                    <u>PAGE</u>

TABLE OF AUTHORITIES...................................................i

MEMORANDUM OF POINTS AND AUTHORITIES..................................1

I.    INTRODUCTION....................................................1

II.   THE PRE-SENTENCE INVESTIGATION REPORT AND RECOMMENDED
      SENTENCE........................................................3

      A.    The Pre-Sentence Investigation Report....................3

      B.    A Substantial Fine is Warranted..........................4

      C.    Restitution..............................................5

      D.    Forfeiture...............................................6

      E.    Government's Recommended Sentence........................6

III.  DEFENDANT'S OFFENSE CONDUCT.....................................7

IV.   SECTION 3553(a) FACTORS.........................................9

V.    GOVERNMENT'S SENTENCING RECOMMENDATION.........................10

      A.    Term of Custody.........................................10

            1.    Nature and Circumstances of the Offense,
                  Seriousness of the Offense, Respect for the Law,
                  and Just Punishment...............................10

            2.    History and Characteristics of Defendant..........15

            3.    The Need for Specific and General Deterrence.......17

            4.    The Need to Avoid Unwarranted Sentence
                  Disparities.......................................21

VI.   CONCLUSION.....................................................22

**TABLE OF AUTHORITIES**

**CASES**

*Dirks v. S.E.C.*,
    463 U.S. 646 (1983) ......................................... 10

*Freudenberg v. E Trade Financial Corp*,
    712 F. Supp. 2d 171, 200 (S.D.N.Y. 2010) ..................... 18

*Gall v. United States*,
    552 U.S. 38 (2007) ........................................... 9

*Molina-Martinez v. United States*,
    136 S. Ct. 1338 (2016) ....................................... 9

*United States v. Brown*,
    880 F.3d 399 (7th Cir. 2018) ................................ 18

*United States v. Carty*,
    520 F.3d 984 (9th Cir. 2008) ................................. 9

*United States v. Goffer*,
    721 F.3d 113 (2d Cir. 2013) ............................. 14, 18

*United States v. Gupta*,
    904 F. Supp. 2d 349 (S.D.N.Y. 2012) ................. 3, 18, 20

*United States v. Heffernan*,
    43 F.3d 1144 (7th Cir. 1994) ............................. 19-20

*United States v. Martoma*,
    48 F. Supp. 3d 555 (S.D.N.Y. 2014) ........................... 3

*United States v. Milken*,
    759 F. Supp. 109, 111-113 (S.D.N.Y. 1990) ................ 15-16

*United States v. Morgan*,
    635 F. App'x 423 (10th Cir. 2015) ........................ 18-19

*United States v. Musgrave*,
    761 F.3d 602 (6th Cir. 2014) ................................ 18

*United States v. Rita*,
    551 U.S. 338 (2007) .......................................... 9

**STATUTES**

18 U.S.C. § 3663A ................................................ 5

18 U.S.C. § 3664(d)(5) ........................................... 6

1988 U.S.C.C.A.N 1603 ...................................... 11 n. 2

i

U.S.S.G. § 2B1.4 ............................................... 4

U.S.S.G. § 3B1.3 ............................................... 4

U.S.S.G. § 4C1.1 ............................................... 4

U.S.S.G. § 5E1.1 ............................................... 5

U.S.S.G. § 5E1.2 ............................................ 4, 5

1          <u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

2    **I.    INTRODUCTION**

3          Defendant Terren S. Peizer ("defendant") awaits sentencing

4    following his conviction by jury of three serious felonies relating

5    to illegal trades he made based on material non-public information

6    that he obtained in his capacity as executive chairman and chairman

7    of the board of Ontrak Inc., a NASDAQ-listed public company.  To

8    commit these crimes, defendant utilized Rule 10b5-1 trading plans

9    and, in doing so, deceived Ontrak, its shareholders, regulators, and

10   the trading public that he was acting in good faith.  In reality, he

11   knowingly used inside information to sell more than $20 million in

12   Ontrak shares and avoid losses of more than $12.5 million.

13         Defendant's conduct strikes at the foundation of our financial

14   markets.  It perpetuates the concern that markets are rigged in favor

15   of the wealthy and well-connected to the disadvantage of the ordinary

16   investor.  This case presents an important opportunity to send a

17   powerful message to defendant and other in-the-know corporate

18   executives that such abuses of trust and deceit of investors will not

19   go unpunished.  The deterrence value here is particularly acute due

20   to defendant's use of Rule 10b5-1 trading plans – a tool designed to

21   *prevent* unlawful insider trading and ensure investor confidence – to

22   engage in insider trading.  Corporate executives should be on notice

23   that efforts to conceal misconduct through the tools created to

24   protect them (and the markets) will come at a significant cost and

25   with severe consequences.

26         As noted in the Pre-Sentence Investigation Report, this was not

27   defendant's first and only time on the wrong side of the law.  Most

28   notably, in 1986, defendant was embroiled in one of the most

notorious financial frauds of the century when the Southern District of New York charged defendant's boss and mentor Michael Milken with conspiracy, securities fraud, mail fraud, market manipulation, and tax fraud. Defendant, after concealing and withholding subpoenaed materials on Milken's behalf, was provided a Non-Prosecution Agreement ("NPA") to cooperate thereby escaping both a felony conviction and prison time. Despite this once in a lifetime opportunity at a second chance, defendant still could not play by the rules and instead cheated the system to prioritize his own financial interests to the detriment of his company and the investing public.

A significant custodial sentence is necessary in this case to reflect the nature and seriousness of defendant's crimes. Moreover, the recommended sentenced will deter future criminal conduct by defendant and others similarly situated who wish to flagrantly violate the laws governing the free and fair operation of the United States' securities markets. For these and the reasons set for below, the United States recommends that the Court impose the sentence recommended by the United States Probation & Pretrial Services Office ("USPO"), including a custodial term of imprisonment of 97 months' imprisonment. Furthermore, the Court should impose a fine of $10.25 million, require restitution to the victim of defendant's crime, impose a sentence of three years of supervised release, and order forfeiture of defendant's ill-gotten gains in the amount of $12,711,324 pursuant to the government's forthcoming motion for a money judgment.

## II.  THE PRE-SENTENCE INVESTIGATION REPORT AND RECOMMENDED SENTENCE

### A.  The Pre-Sentence Investigation Report

On November 21, 2024, the USPO issued its Pre-Sentence Investigation Report ("PSR") for defendant and a recommendation letter. (PSR, Dkt. 375; Recommendation Letter, Dkt. 374.) The USPO calculated that defendant's total offense level under the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") was 30 and determined that defendant falls within Criminal History Category I, which results in an advisory Guidelines range of 97-121 months' imprisonment. (PSR ¶ 132.) The USPO recommended that the Court sentence defendant to a sentence of 97 months' imprisonment on each of Counts 1, 2, and 3 to be served concurrently. (Dkt. 374 at 2.) The USPO further recommended that the Court impose restitution, a three-year term of supervised release, a fine of $10,250,000, and a mandatory special assessment of $300. (Id. at 1-2.)

The government has no objections to the PSR and agrees with the PSR's calculation of the applicable Guidelines range. Notably, as established at trial, defendant avoided losses under defendant's May and August Trading Plans was $12,711,324. (PSR ¶¶ 63-64.) Courts determining the applicable Guidelines range for insider trading have regularly considered both the profits gained from insider trading in advance of positive news as well as the losses avoided from selling prior to the announcement of negative news. See United States v. Martoma, 48 F. Supp. 3d 555, 566 (S.D.N.Y. 2014) (including both "profits and avoided losses" associated with the insider trading conduct); United States v. Gupta, 904 F. Supp. 2d 349, 352 (S.D.N.Y. 2012), aff'd, 747 F.3d 111 (2d Cir. 2014) ("it seems reasonably clear to this Court that the comment limits the calculation to gains made

or losses avoided in trades that were based, in whole or in part, on the inside information"). The PSR also properly applied the two-point enhancement based on defendant's role as Ontrak's executive chairman and board chairman. U.S.S.G. § 2B1.4, Application Note 2 (The Abuse of Position of Trust or Use of Special Skill enhancement at U.S.S.G. § 3B1.3 "should be applied if the defendant occupied and abused a position of special trust. Examples might include a corporate president or an attorney who misused information regarding a planned but unannounced takeover attempt."). The Zero-Point Offender does not apply because defendant received criminal history points. U.S.S.G. § 4C1.1(a)(1); PSR ¶ 82. Accordingly, the government agrees with the PSR that defendant's applicable Guidelines range is 97-120 months' imprisonment. (PSR ¶ 132.)

### B.   A Substantial Fine is Warranted

The PSR calculates the fine range for defendant's offense at $30,000 to $10,250,000. (PSR ¶ 142.) The USPO then recommends that defendant be fined the statutory maximum fine of $10,250,000, which is the high end of the applicable Guidelines range. (Dkt. 374 at 1.) The government agrees. The Guidelines instruct that, "[t]he court shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine." U.S.S.G. § 5E1.2(a). Some of the factors the Court must consider when determining whether a fine is appropriate are: (1) "any evidence presented as to the defendant's ability to pay the fine;" (2) "the burden that the fine places on the defendant and his dependents relative to alternative punishments;" (3) "any restitution or reparation that the defendant has made or is obligated to make;" and (4) "whether the defendant previously has been fined

4

for a similar offense." U.S.S.G. § 5E1.2(d)(2)-(4), (6). Given
defendant's clear ability to pay, the absence of any burden on him to
pay such a fine, that the anticipated restitution is only a fraction
of the applicable fine, and that defendant has never been fined for
this conduct, the proposed fine is particularly appropriate.
Moreover, in light of defendant's serious misconduct and the
financial motives underlying his criminal conduct, a fine is an
important and wholly appropriate component of defendant's sentence.
Such a fine is also necessary to reflect the seriousness of
defendant's offense, promote respect for the law, and afford
deterrence, particularly when coupled with the government's and
USPO's positions that defendant be sentenced near the bottom of his
advisory guideline range. See U.S.S.G. § 5E1.2(d)(1). Ultimately, a
$10,250,000 fine is consistent with the goal that the amount of the
fine "should always be sufficient to ensure that the fine, taken
together with other sanctions imposed, is punitive." U.S.S.G. §
5E1.2(d). The government also concurs with the PSR and USPO that
defendant is able to and should pay the fine immediately. (PSR ¶
129; Dkt. 374 at 1.)

        **C.    Restitution**

        Restitution is mandatory in this case. 18 U.S.C. § 3663A. The
PSR concludes that restitution should be ordered pursuant to U.S.S.G.
§5E1.1. (PSR ¶ 146.) The victim in this case is Ontrak, the public
company whose material nonpublic information defendant converted for
his own use and personal financial gain. (Id. ¶ 52.) At the time
of this filing, the government has not yet received a final
restitution calculation from Ontrak. In addition, the government is

still working with Ontrak on how best to ensure that defendant, as

the largest shareholder of the company, is not the beneficiary of any

restitution paid to Ontrak.  As such, the government and Ontrak

intend to file further submissions regarding restitution before the

sentencing.  Pursuant to 18 U.S.C. § 3664(d)(5), a deferred

restitution hearing may be calendared at a date not later than 90

days after the defendant's sentencing hearing.

D.    **Forfeiture**

The First Superseding Indictment included a forfeiture

allegation.  (Dkt. 105.)  The government has prepared and will file

with this Court an application for a money judgment of forfeiture in

the amount of $12,711,324.  This amount reflects financial benefits

received by defendant in connection with the criminal scheme for

which he was convicted, as established through the evidence admitted

at trial.  This money judgment is necessary and appropriate to

forfeit the proceeds that came to defendant as a result of his

offenses of conviction.

E.    **Government's Recommended Sentence**

For the reasons stated below, the government agrees with the

USPO's recommendation and respectfully recommends that the Court

sentence defendant to 97 months in custody, three years of supervised

release, a mandatory special assessment of $300, restitution to the

victim, and a fine of $10.25 million.  Additionally, in connection

with the government's forthcoming application, the Court should enter

a forfeiture money judgment in the amount of $12,711,324.

**III. DEFENDANT'S OFFENSE CONDUCT**

Having presided over defendant's jury trial as well as the parties' extensive pre- and post-trial motions, this Court is well versed in the facts and evidence marshalled against defendant in this case.  The below is summary of the offense conduct based on the facts included in the PSR.[1]

During the relevant time period, defendant was the founder, executive chairman, and chairman of the Board of Directors of Ontrak. By virtue of his role, defendant was privy to Ontrak's material nonpublic information, including inside information that Ontrak was in serious jeopardy of losing its then-largest customer, Cigna.

In early May 2021, with full knowledge of the deteriorating relationship between the two companies, defendant contacted multiple brokers to set up a Rule 10b5-1 trading plan in order to sell hundreds of thousands of shares of Ontrak.  Defendant consulted multiple brokers until he could find one that did not require a cooling-off period so that he could sell as soon as possible. Defendant cited the expiring nature of warrants he controlled as a reason for selling, but he knew that while the warrants needed to be exercised, he was under no obligation or pressure to sell the underlying shares.  (See, e.g., Trial Tr. 2062:18 – 2063:22.)  On May 10, 2021, defendant entered into a Rule 10b5-1 trading plan (the "May Trading Plan").  As part of the May Trading Plan, defendant falsely

---

[1] Facts taken from sources other than the PSR are noted in separate parenthetical citations.

7

certified that he was not in possession of material nonpublic

information despite that he did possess material nonpublic

information regarding the serious risk that Cigna would terminate its

contract with Ontrak.  Pursuant to the May Trading Plan, defendant

sold approximately 585,000 shares resulting in approximately

$18,906,000 in proceeds.

Between May and August of 2021, defendant continued to receive

even more material nonpublic information that Cigna would likely

terminate its relationship with Ontrak.  On August 13, 2021,

defendant called Ontrak's lead negotiator to learn whether Ontrak

would retain Cigna as a customer.  On that call, the employee

informed defendant that he believed Cigna was likely to formally

terminate its relationship with Ontrak.  That same day, within five

minutes after this call, defendant entered into a second Rule 10b5-1

plan (the "August Trading Plan") to sell even more Ontrak shares.

Prior to implementing the August Trading Plan, defendant again

falsely certified that he was not in possession of material nonpublic

information, when in fact, he did possess such information.  Like the

May Trading Plan, the August Trading Plan did not implement a

cooling-off period and defendant began selling Ontrak shares the next

trading day.  Prior to Ontrak's public announcement that Cigna had

terminated its contract with Ontrak, defendant sold approximately

45,000 Ontrak shares over the course of three trading days, resulting

in approximately $900,000 in proceeds.  On August 18, 2021, Cigna

formally notified Ontrak that it would terminate its contract with

Ontrak.  On August 19, 2021, Ontrak filed a Form 8-K with the SEC disclosing for the first time the termination of its relationship with Cigna.  Following the announcement, Ontrak's stock price fell approximately 44%.

Under the May Trading Plan, defendant made a profit of $19,213,498.  However, if the same amount of shares were sold on August 19, 2021, following the public announcement, the same sale would have only led to a profit of $6,695,450.  As such, defendant had a loss avoidance of $12,248,045 for the May Trading Plan.  Under the August Trading Plan, defendant made a profit of $988,876.  However, if the same amount of shares were sold on August 19, 2021, following the public announcement, the same sale would have only led to a profit of $525,600.  As such, defendant had a loss avoidance of $436,276 for the May Trading Plan.  In total, defendant had a loss avoidance of $12,711,324.

**IV.   SECTION 3553(a) FACTORS**

The Court should impose a sentence sufficient, but not greater than necessary, to reflect the purposes of sentencing identified in 18 U.S.C. § 3553(a).  United States v. Carty, 520 F.3d 984, 991 (9th Cir. 2008).  The advisory Guidelines range provides the "starting point and . . . initial benchmark" for the Court's consideration of an appropriate sentence.  Molina-Martinez v. United States, 136 S. Ct. 1338, 1345 (2016) (quoting Gall v. United States, 552 U.S. 38, 49 (2007)).  Although the Guidelines are not binding, they "reflect a rough approximation of sentences that might achieve section 3553(a)'s objectives."  United States v. Rita, 551 U.S. 338, 350 (2007).

Under 18 U.S.C. § 3553(a), in arriving at the appropriate sentence, the Court should consider, among other factors, the nature and circumstances of the offense and the history and characteristics of the defendant, § 3553(a)(1); the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense, § 3553(a)(2)(A); the need for the sentence imposed to afford adequate deterrence to criminal conduct, § 3553(a)(2)(B); the need for the sentence imposed to protect the public from further crimes of the defendant, § 3553(a)(2)(C); the kinds of sentences available, § 3553(a)(3); and the need to avoid unwarranted sentence disparities, § 3553(a)(6).

## V.   GOVERNMENT'S SENTENCING RECOMMENDATION

### A.   Term of Custody

In light of the relevant § 3553(a) factors, a sentence of 97 months' incarceration, which is at the bottom of the applicable Guidelines range, is sufficient, but not greater than necessary, to achieve the goals of sentencing here.

    1.   Nature and Circumstances of the Offense, Seriousness of the Offense, Respect for the Law, and Just Punishment

Insider trading is a serious offense.  It undermines confidence in the markets, betrays the trust of investors in public companies, and is simply the conversion of a company's propriety information for personal purposes.  "In an inside-trading case [the] fraud derives from the 'inherent unfairness involved where one takes advantage' of 'information intended to be available only for a corporate purpose and not for the personal benefit of anyone.'"  Dirks v. S.E.C., 463 U.S. 646, 654 (1983) (quoting In re Merrill Lynch, Pierce, Fenner &

10

1    <u>Smith, Inc.</u>, 43 S.E.C. 933, 936 (1968)).  The consequences of insider

2    trading are real: such misconduct is widely perceived as cheating,

3    and it deters ordinary investors — without the advantages enjoyed by

4    insider traders — from investing in the markets.[2]  Illegal insider

5    trading continues to be a source of great public anger toward Wall

6    Street as example after example invokes the imagery of an unlevel

7    playing field in our nation's financial markets – and it perpetuates

8    the perspective that that playing field is tilted against the

9    ordinary citizen in favor of the powerful insider.  Not only does

10   insider trading harm the integrity of the markets, but it also harms

11   public companies whose business secrets are misappropriated for

12   personal gain.

13        In this case, a 97-month sentence constitutes just punishment

14   because it is commensurate with the nature, scope, and seriousness of

15   defendant's crime as discussed above.  Defendant, as executive

16   chairman and chairman of the board, abused his position of trust by

17   using his access to material nonpublic information about Cigna to

18   engage in an insider trading scheme that netted him more than $12

19   million in losses avoided.  To execute the scheme, defendant used

20   ─────────────────

21        [2] <u>See</u> Insider Trading and Securities Fraud Enforcement Act of
     1988, H.R. Rep. No. 100-910, at 7-8 (1988), <u>reprinted in</u> 1988

22   U.S.C.C.A.N. 6043,6044, (stating that "[i]nsider trading damages the
     legitimacy of the capital market and diminishes the public's faith …

23   [T]he small investor will be – and has been – reluctant to invest in
     the market if he feels it is rigged against him"); H.R. Rep. No. 98-

24   355, at 5 (1983) (emphasizing that "[t]he abuse of informational
     advantages that other investors cannot hope to overcome through their

25   own efforts is unfair and inconsistent with the investing public's
     legitimate expectation of honest and fair securities markets where

26   all participants play by the same rules"); Arthur Levitt, <u>A Question
     of Integrity: Promoting Investor Confidence By Fighting Insider

27   Trading</u>, in vital Speeches of the Day, Vol. LXIV, 354, 355 (Apr. 1,
     1998) ("The American people see it, bluntly, as a form of

28   cheating.").

multiple Rule 10b5-1 trading plans over multiple months to deceive his company, regulators, and the investing public into believing that he was acting in good faith.  In reality, he was using the very tool designed to prevent insider trading in order to engage in illegal insider trading.  As the USPO recognized, defendant's actions were significant because "there was no doubt or ambiguity regarding the illegal nature of his actions, and he in fact received multiple warnings from multiple brokers regarding his actions, which he disregarded." (Dkt. 347 at 6.)  Defendant was a sophisticated financial player – a former trader, a long-time investor and financier, and ultimately a public company CEO and board chairman. Defendant's own witness and Ontrak's former general counsel even referred to him as a "capital markets whiz kid."  (Tr. 2268:21-23.) Put simply, defendant knew better than to do what he did.  And yet he did it anyway.

His trades were even more brazen in light of the manipulation necessary to effectuate his conduct – using the guise of a Rule 10b5-1 plan to conceal his trading, seeking out a broker with no cooling-off period, disregarding the advice of brokers and lawyers, and trying to hide behind corporate process to claim transparency. Additionally, defendant's text messages to his trading friends and family during the time of his sales reveal the duplicity of his conduct,[3] as he told them to either sell, invest in other companies he controlled, or not to buy Ontrak's stock. (Dkt. 162 at 3-6, 162-4 – 162-7.)  Defendant framed his conduct to the board, other

---

[3] Certain of this evidence was admitted at trial (Exs. 300, 305, 309A), and other evidence was not admitted or excluded at trial, but the Court can still consider such information in connection with sentencing.

12

executives, his broker, and outside counsel as being for one (legitimate) purpose, while his texts to trading friends and family reveal his full realization of Ontrak's dire situation with Cigna. Similarly, his text messages with his trusted advisor, Shona Seifert, and CEO Jonathan Mayhew contained his true views on the company's standing with Cigna: comparing it to Aetna and bluntly assessing the gravity of the situation. (Exs. 419, 702, 326B, 327.) These unvarnished messages demonstrate that defendant knew the near existential threat posed by the situation and, yet, he said whatever he needed to in order to sell stock anyway.

His conduct is all the more egregious because defendant utilized the same fraudulent device on multiple occasions with two different trading plans only months apart. The second trading plan capped off defendant's most shameless conduct where he called an employee (multiple levels below him in the corporate pecking order) to ask whether Cigna was going to terminate. Just five minutes after hearing that "if I had to call it, that I would say that they are going to terminate[,]" defendant falsely certified he had no material nonpublic information and entered into his second 10b5-1 trading plan. (Exs. 515, 608; Tr. 1293:8-1294:9.)

Lastly, to effectuate his scheme, defendant needed to lie, a lot: he lied to the company (twice) by falsely signing preclearance forms; he lied to his broker (twice) by falsely signing Representation 1.1 in his 10b5-1 plans that he had no material nonpublic information; he lied (twice) to the U.S. Securities & Exchange Commission in his Form 144s despite a § 1001 warning; and he lied (twice) to the market when he included his false and misleading 10b5-1 plans with his Schedule 13D filings. (Exs. 1, 2, 55, 64, 66,

13

67, 254, 259, 345B, 504, 511A.)  Then, when confronted by the FBI about his conduct, defendant did not show remorse or take responsibility.  Instead, he lied at least four more times to cover up his crimes.  (Exs. 802, 804-807.)

This was not a crime of happenstance or opportunity – defendant's fraudulent conduct was pervasive, and his scheme was complex.  Defendant saw an opportunity – the writing was on the wall after Aetna's termination – and he took full advantage of his powerful perch to avoid additional significant losses.  He was among the few insiders to know what was coming for Ontrak's stock price and he was going to take advantage.  Defendant's gain was not victimless.  Serious insider trading, like defendant's, undermines markets.  See United States v. Goffer, 721 F.3d 113, 132 (2d Cir. 2013) (insider trading gain of approximately $11 million "had major deleterious effects on the market").  Repeated conduct, like defendant's, only amplifies the seriousness of the misconduct and the need for meaningful punishment.  This scheme is reflective of deliberate choice and greed.  The barriers to insider trading were not impediments to defendant, but tools for exploitation.  Defendant methodically played the various institutions and safeguards off one another to present a venire of legitimacy to his trading and to deflect scrutiny.  This represents a depravity and lack of respect for the law that requires severe consequences.  See Goffer, 721 F.3d at 132 (upholding a district court's imposition of a 66-month sentence in an insider trading case with gains of approximately $11 million where sentencing court cited defendant's "lack of respect for the law and his deliberate decision, weighing the risks, that insider trading 'was a game worth playing.'").  Defendant was the clever

14

insider and he masterfully, and illegally, rigged the system in his favor without concern for the legal obstacles in his way.

Defendant's trades occurred on public markets and his trading plans were broadcast to the trading public and regulators through his SEC filings.  The recommended 97-month sentence addresses this nature and seriousness of this conduct, defendant's lack of respect for the law, and the need for just punishment.

### 2.  History and Characteristics of Defendant

Defendant was born into a good community and spent a lifetime full of advantage and privilege.  (PSR ¶¶ 92-97.)  He attended a premier business school at an Ivy League university and his first job was at Goldman Sachs, a highly regarded investment bank.  ( Id. ¶¶ 98-9.)  As the PSR notes, defendant has enjoyed great success professionally and, as a result, holds hundreds of millions of dollars in assets.  ( Id. ¶¶ 99, 124.)  Yet, despite his excellent education and vast resources, defendant chose to employ his talents for a harmful purpose — to break the law — and showed his willingness to do so repeatedly with at least two different trading plans.

Equally troubling is that this was not defendant's first or even second run in with the law.  As noted above, in 1986, despite concealing subpoenaed records from the government, defendant was provided an NPA in exchange for cooperating against Milken.  See United States v. Milken, 759 F. Supp. 109, 111-113 (S.D.N.Y. 1990) (Fatico hearing findings recounting defendant's testimony that he provided subpoenaed documents, namely "the blue ledger book containing entries evidencing the unlawful agreement between David

15

Solomon and Michael Milken[,]" to Milken's assistant at Milken's direction for which he was given "a grant of immunity from both criminal prosecution and SEC sanction").  In essence, defendant was given a once in a lifetime opportunity to start fresh and to escape serious criminal jeopardy relatively unscathed.  And yet, despite this stroke of fortune, defendant continued to engage in conduct that required legal attention.  As noted in the PSR, defendant has had multiple additional encounters with law enforcement due to a history of driving under the influence and engaging in disorderly conduct. (PSR ¶¶ 82-85; 88-90).  Of particular significance is defendant's interactions with law enforcement approximately ten years ago when he was arrested for disorderly conduct.  According to the PSR, during his interactions with law enforcement, defendant became very combative and at one point yelled: "I don't have to tell you anything! I just want to go home! You guys are making a big mistake! You have no idea who I am! My lawyers will be contacting you in the morning!".  (Id. ¶ 85.)  Due to his aggressive behavior, he was arrested.  (Id.)  Unsurprisingly, defendant displayed a similar level of disrespect and entitlement when he was interviewed by the FBI in connection with the instant matter. See, e.g., Exs. 802, 804-807. Defendant's prior conduct in connection with a federal investigation, his interactions with law enforcement, and his recidivism, all reflect his disregard for the law and those tasked with its enforcement.  Indeed, his insider trading scheme and interactions with the FBI demonstrate that he continues to believe he is not only

16

above the law, but that he can get away with his behavior because of his position of power and privilege. As such, a significant custodial sentence is necessary to ensure that defendant faces the full consequences for his misconduct and to meet the statutory mandate that the sentence promote respect for the law. <u>See</u> § 3553(a)(2)(A).

### 3. The Need for Specific and General Deterrence

There is significant general deterrent value to the government's recommended sentence. As the first federal insider trading prosecution based solely on Rule 10b5-1 trading plans, this case presents a critical opportunity for the Court to send a clear message to corporate executives poised to exploit their companies' inside information for personal advantage. As the government stressed at trial and the jury reflected in its verdict: Rule 10b5-1 trading plans are not a protective blanket that corporate executives can use to evade accountability. A serious sentence here will ensure other corporate executives know that they cannot play by their own set of rules. The deterrent power for the sentence in this particular case is only amplified by defendant's use of a tool that is traditionally intended to protect both executives and investors. A critical exhibit in this case – sent to defendant on the eve of his fraudulent scheme – aptly noted that a "Rule 10b5-1 trading plan may give rise to an inference of scienter because 'a clever insider might 'maximize' their gain from knowledge of an impending price drop over an extended amount of time, and seek to disguise their conduct with a 10b5-1 plan.'" (Ex. 100 (quoting

17

Freudenberg v. E Trade Financial Corp., 712 F. Supp. 2d 171, 200 (S.D.N.Y. 2010)).)  Exploitive abuses, such as defendant's, must be adequately addressed in order to send a clear message to public company executives that such conduct has severe consequences.  Indeed, the government's prosecution in this case drew significant attention from the financial press and defendant's sentence will surely echo across Wall Street.

General deterrence plays an important role in the sentence.  White collar crimes, like insider trading, are difficult and costly to detect and prosecute.  Would-be criminals know this and likely consider the low prospects of apprehension in deciding whether to engage in such conduct.  See United States v. Brown, 880 F.3d 399, 405 (7th Cir. 2018), citing Goffer, 721 F.3d at 132 (noting that "high sentences" were necessary to alter the calculus "that insider trading 'was a game worth playing'"); see also Gupta, 904 F. Supp. 2d at 355 (observing that, where a crime is hard to detect, "others similarly situated to the defendant must therefore be made to understand that when you get caught, you go to jail").  For that reason, the sentence imposed needs to correct this imbalance and confirm that those considering engaging in these crimes do not do so.  As another court has explained, "fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, [so,] these crimes are prime candidates for general deterrence."  United States v. Musgrave, 761 F.3d 602, 609 (6th Cir. 2014).  Accordingly, general deterrence is a "crucial factor in sentencing decisions for economic . . . crimes."  United States v.

Morgan, 635 F. App'x 423, 450 (10th Cir. 2015); see also S. REP. 98-225, at 76 (legislative history of § 3553 notes that deterrence is "particularly important in the area of white collar crime"). Because of the seriousness of the crime, the difficulty in detecting and prosecuting it, the needs of general deterrence merit a significant sentence.

The literature is clear that abuses of 10b5-1 trading plans are robust. But, as this case demonstrates, enforcement actions are scant. Academic research has established that trades under "preset plans on average outperform similar trades not conducted under such plans." Alan D. Jagolinzer, SEC Rule 10b5-1 and Insiders' Strategic Trade (February 1, 2009) MANAGEMENT SCIENCE (available at https://ssrn.com/abstract=541502). And short-trigger plans by executives, like defendant, who trade soon after entering in 10b5-1 trading plans "systematically avoid losses and foreshadow considerable stock price declines." David Larcker, Bradford Lynch, Phillip J. Quinn, Brian Tayan, and Daniel J. Taylor, Gaming the System: Three 'Red Flags' of Potential 10b5-1 Abuse (January 19, 2021) ROCK CENTER FOR CORPORATE GOVERNANCE AT STANFORD UNIVERSITY (available at https://ssrn.com/abstract=3769567). In other words, defendant engaged in misconduct using a tool ripe for fraud, but under prosecuted. In such instances – where crimes, like insider trading, are both highly lucrative and difficult to detect – significant punishment is necessary to deter others from similar conduct. See United States v. Heffernan, 43 F.3d 1144, 1149 (7th Cir. 1994) (Posner, J.) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since

19

both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it."). As one district court explained: "insider trading is an easy crime to commit but a difficult crime to catch. Others similarly situated to the defendant must therefore be made to understand that when you get caught, you will go to jail." Gupta, 904 F. Supp. 2d at 355. Other public company executives – whether using Rule 10b5-1 trading plans or other tools that can be exploited to conceal illegal trading – should be put on notice through the sentence in this case that abuses of corporate power for personal profit will be met with substantial terms of incarceration.

Finally, here, in light of defendant's continued interest in a number of public companies, there remains a real risk of future insider trading abuse. (PSR ¶ 124 (including a $250 million position in one public company).) The recommended sentence will have a meaningful specific deterrent effect on defendant himself. While defendant's conviction may make it more difficult for him to achieve high-ranking roles at the public companies he is invested in – and therefore mitigate the likelihood that he will be privy to material nonpublic information – his capacity to purchase shares and insert himself in powerful roles in the future is not far-fetched. Given defendant's continued role as a shareholder of significant means in multiple public companies, the risk that he could again capitalize on his privileged access to corporate information is high. And, as defendant already engaged in misconduct in connection with a federal fraud investigation decades ago, and still engaged in recidivist behavior, the Court's sentence should be sure to provide the necessary deterrence this time to prevent defendant from committing additional crimes. In this regard, the

recommended sentence adequately addresses the statutory need for specific deterrence.

    4. <u>The Need to Avoid Unwarranted Sentence Disparities</u>

Finally, a sentencing court is also required to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). Although no two cases are the same, the sentence imposed by this Court, <u>United States v. Loman</u>, 2:19-cr-00695-DSF, is a helpful guidepost here. In <u>Loman</u>, the defendant was convicted by a jury of eight counts of insider trading and Loman profited in the amount of approximately $476,000. The Court sentenced Loman to 35 months' imprisonment. <u>See</u> <u>Loman</u>, Judgment, Dkt. 122. Like Loman, defendant had access to material, non-public information by virtue of his position at a company and used that information to trade. Defendant's conduct is even more egregious given the more prominent roles he held in the company and his position as a nearly 50% shareholder in Ontrak. In addition, defendant avoided over $12.6 million in losses, which is exponentially more than Loman's profits.

Another example of a significant custodial sentence being imposed for insider trading is <u>United States v. Martoma</u>, 1:12-cr-00973-PGG, Dkt. 293 at 4-5 (S.D.N.Y. 2014). In <u>Martoma</u>, the defendant caused his hedge fund to trade after obtaining inside information about unsuccessful drug trials from two doctor consultants to the company. <u>Id.</u> While the hedge fund was able to realize significantly greater profits and losses avoided than in this case, the defendant's personal

21

gain in <u>Martoma</u> was comparable to defendant's avoided losses: a $9.3 million bonus.  <u>Id.</u>  The defendant in <u>Martoma</u> was sentenced to 108 months' incarceration.  <u>Id.</u>, Dkt. 315.

These sentences are simply probative of the appropriate nature and range of insider trading sentences judges give for similar conduct, and undermine any claims defendant may make that a Guidelines sentence would result in an unwarranted sentencing disparity.  Thus, the government's recommendation for a 97 month term of imprisonment would not result in an unwarranted sentencing disparity among defendants with similar records who have been found guilty of similar conduct.

**VI.    CONCLUSION**

For the above reasons, the government respectfully requests that the Court impose the following sentence as to defendant Terren S. Peizer: (1) 97 months' imprisonment; (2) a three-year period of supervised release; (3) a fine of $10.25 million; (4) restitution to be determined at a later date; and (5) a mandatory special assessment of $300.